KAHN, J.T.C.
This is a local property tax case wherein plaintiff seeks a reduction of the assessment upon property located at 128 River Drive, Garfield, New Jersey (Block 81, Lot 50) for the tax year 1983. The assessment for 1983 was as follows:
*634 Land $140,000
Building $789,300
Total $929,300
The issues are valuation and discrimination.
The property consists of 1.08 acres of land improved with a two-story brick garden apartment building with open parking for 40 ears. The building, completed in 1974, contains 37 units, including the superintendent’s apartment, of which, two contain 4.5 rooms and the balance 3.5 rooms.
All leases are for a one-year term. The landlord provides heat, water, a refrigerator, stove and air conditioner for each apartment. The tenant pays electricity. The building is generally well-maintained and in good condition. The neighborhood is zoned mixed residential and commercial. No rent-control ordinance was in effect as of the assessment date.
Plaintiff’s expert utilized only the income capitalization approach to valuation. He relied upon the existing rental stream, represented by the rent rolls as of the assessment date, October 1, 1982. These figures were obtained and verified by the expert through plaintiff’s accountants. The existing rents for the thirty-four 3.5 room apartments ranged from $370 a month to $450 a month.[1] Eight of these rented for less than $400, while ten rented for $450. No calculable adjustments were made to adjust for any locational or physical differences in the individual apartments.
In attempting to bolster his view that the actual rents were economic, the expert examined other allegedly similar apartment buildings in several other communities, including Lodi, Mahwah, Fort Lee, Palisade Park and Leonia. He made specific adjustments, where necessary, for the presence of rent control, location, access to major highways, accessibility to employment areas and the character of the community. These adjustments, which resulted in an average rental of $410, were *635 made to bolster the expert’s opinion that the rentals of the subject property, which averaged $400, were economic. The witness concluded from his knowledge of the owner of the subject property, his examination of the financial statements and his review of the comparable rents that the subject was well-managed.
Based upon these considerations, he opined that the monthly income stream as of the assessment date was economic. He annualized this October 1,1982 rental ($15,130 x 12) to derive a rental income for the pretax year in the amount of $181,560. The following constitutes a capsulized view of his projected income and expenses:
GROSS INCOME
Potential Rental Income @ $15,130/mo $181,560
Allowed for Vacancy & Collection Loss (2%) - 3,630
$177,930
Laundry Commissions 864
Miscellaneous Income _200
$178,994
EXPENSES
Insurance $ 2,324
Gas (Fuel) 10,659
Water & Sewer 1,950
Electricity 4,178
Garbage Disposal 1,276
Superintendent
Salary 2,850
Payroll Taxes 300
Maintenance & Repairs 12,000
Painting
Exterior & Halls ($3,000/5 yrs.) 600
Apartments (129.5 rooms at $50/4 yrs.) 1,620
Replacements
Refrigerators (37 at $325/12 yrs.) 1,000
Stoves (37 at $275/15 yrs.) 680
Air Conditioners (37 at $275/10 yrs.) 1,020
Management & Advertising 9.000
Professional Fees & Miscellaneous 2.000
$ 51,457
NET INCOME TO PROPERTY $127,537
*636 In determining the appropriate capitalization rate the taxpayer’s witness utilized a mortgage-equity technique consisting of the following findings and recommended computations:
MORTGAGE-EQUITY TECHNIQUE
Mortgage Ratio 75%
Equity Ratio 25%
Mortgage Interest Rate 13.00%
Mortgage Payout Term 25 yrs
Mortgage Annual Constant 13.53%
Equity Return 10.00%
NET INCOME TO PROPERTY $127,537
Capitalization Rate: 75% x 13.53% = 10.15%
25% x 10.00% = 2.50%
12.65%
Effective Tax Rate = 2,38%
15.03%
Value: $848,550 ($127,537 ^ 15.03%) (rounded to $850,000)
Taxpayer’s witness utilized a 2% vacancy-and-collection-loss factor which reflected the difference between the October 1, 1982 annualized rent rolls and the actual rent collected in 1982.
In estimating expenses he utilized both actual and projected expenses. For instance, with respect to maintenance and repairs, including painting, he indicated that the actual expenses were less than the expected projections in the field, which he found from experience averaged from 9.7% to 13% of gross rents. He therefore posited $12,000 as an allowance for maintenance and repairs, before painting. With respect to replacements, he set up reserves, based on his experience managing apartment buildings, for the expected lives of refrigerators (12 years), stoves (15 years) and air conditioners (10 years). He *637 also stabilized expenses for management, advertising and professional and miscellaneous fees, which he claimed were supported by the actual expenses and were within normal limits based on his experience.
The municipality produced one witness who was identified in the pretrial proceedings as a proposed expert witness. At the trial he was not qualified by counsel to render an expert opinion and testified only as a fact witness with respect to two comparable sales of garden-apartment complexes located in Garfield. The essence of his testimony was a statement that the sales reflected $11,111 a room for sale number one and $7,812 a room for the second sale mentioned by the witness. The witness rendered no conclusion as to value and his valuation report was not moved into evidence.
The municipality contended that taxpayer failed to produce sufficient evidence to demonstrate that its existing rent roll was economic. In support of this claim, the municipality placed into evidence the rent rolls for October 1, 1980 and October 1, 1981. These rent rolls contained the names of the tenants of the various apartments, and the rent rolls demonstrate that when the same tenant had re-let in 1981, the rent increase was limited to 8% to 12%. When the apartments changed hands, the increase during this same period was significantly more. For instance, apartment number nine rented for $330 in 1980 and $350 in 1981 when it was rented by the same tenant. Contrast this with apartment number 22, which rented for $330 in 1980 but increased to $400 in 1981 when a new tenant moved in.
The 1982 rent roll does not list the tenants. However, a pattern similar to that of the 1980-1981 period emerges when the 1982 rent roll is compared to that of 1981. Most of the apartments experienced the same 8% to 12% increase during this period. However, others experienced a much greater increase. Among those were the following:
*638 RENT RENT PERCENTAGE
APARTMENT October 1, 1981 October 1, 1982 INCREASE
#4 $340.00 $450.00 32%
#7 $315.00 $450.00 43%
#10 $310.00 $450.00 45%
#16 $325.00 $450.00 38%
#28 $330.00 $450.00 36%
#29 $360.00 $450.00 25%
#31 $345.00 $450.00 30%
While no documentation was presented to demonstrate that the larger increases only occurred when there was a turnover in tenants, I believe such an inference is consistent with the other evidence in this case. For example, taxpayer’s own witness indicated that the turnover was low in 1982, thereby lending credence to this inference since only a small number of apartments experienced the comparatively large increases. Also persuasive are the 1980 and 1981 rent rolls placed in evidence, which indicate that rent increases during that span were significantly greater when tenants moved in. The witness also defended the practice of favoring older tenants, claiming it was good management practice. Defendant contends that the practice of favoring older tenants with lower rent increases detracts from plaintiff’s claim that the actual rent roll is economic.
As previously stated, defendant produced no expert testimony, and thus produced no affirmative evidence of vacancy and collection losses, expenses or capitalization rate. For each of these matters defendant attempted to use plaintiff's own evidence against its witness on cross-examination and also attacked the sufficiency and credibility of the evidence submitted. Much of the attack is focused on the capitalization rate, which defendant claims is unsupportable even by the materials appended to its expert’s report.
Since defendant produced no expert, this case centers solely on the reliability of plaintiff’s expert. Many of the facts proffered by plaintiff’s expert are uncontested. Defendant *639 acknowledged the accuracy of the October 1, 1982 rent roll, the physical description and highest and best use of the subject property. The points of contention in this case are directed at the expert’s use of these facts in formulating his opinion. The expert’s opinion, even if derived from undisputed facts, will be rejected if the opinion is not supported by these facts. The weight to be given any expert testimony depends on the facts and reasoning which are the foundation of his opinion. Schmertz v. Dover Tp., 4 N.J.Tax 145, 151 (Tax Ct.1982); Passaic v. Gera Mills, 55 N.J.Super. 73, 90, 150 A.2d 67 (App.Div.1959). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. den. 79 N.J. 483, 401 A.2d 239 (1979).
Taxpayer seeks to establish that the actual rent rolls are economic. In support of this contention its expert offers the adjusted rentals of numerous garden apartments in the surrounding area. Where rent control was in effect, he attempted to limit his examination to vacancy decontrolled apartments in order to equate them with Garfield, which had no rent control. After adjustments, he opined that economic rent was approximately $410 a month for a 3.5 room apartment.
I find the expert’s conclusion unsupported by the facts upon which he relies. The evidence suggests, and I find, that the landlord in this case granted lower rent increases to tenants renewing their leases than to new tenants. The rent roll for October 1, 1982 demonstrates that ten 3.5-room apartments were achieving rentals of $450 a month. These rents were achieved by increases generally in excess of 20% over the 1981 rents, suggesting that the subject property is capable of sustaining significant increases while maintaining stability. There has been no demonstration by plaintiff that these apartments are superior in any way to the other lower rental apartments. The witness discussed in general terms the differing views, locations and exposures in the apartment complex, but failed to specify which apartments are different and how much these *640 differences account for in rental dollars. I therefore conclude that the economic rent for a 3.5-room apartment is $450 a month, the highest rent charged for that apartment in the garden apartment complex.
Judge Crabtree considered similar facts in reaching his conclusion in Rudd v. Cranford Tp., 4 N.J.Tax 236 (Tax Ct.1982):
On the basis of the facts hereinabove found with respect to the variations in rents charged for identical units and the wide range of percentage increases in rents over a four year period, I conclude that the economic rent for each class of apartment is the highest rent charged therefor, as it appears that the landlord favored his long time tenants with below market rents, increasing those rents substantially only when the old tenants vacated the premises and the new tenants moved in. [at 243]
I find that in a nonrent-control community, where no obvious differences exist between apartments, the economic rent for each apartment should be the highest rent charged for a unit of that size in the subject apartment building, unless taxpayer can demonstrate that that rent is somehow an aberration. Economic rent for an apartment complex should be determined by the rental value of each unit and not, as plaintiff’s expert suggests, some rent total for the complex as a whole.
Plaintiff relies on Parkview Village Assoc. v. Collingswood62 N.J. 21, 297 A.2d 842 (1972) which held:
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation, [at 34, 297 A.2d 842]
Plaintiff’s expert testified that in his opinion the subject property is well-managed. Plaintiff, therefore, argues that the current income scale, represented by the October 1, 1982 rent roll, is prima facie the fair rental value of the subject. I cannot agree. The rent roll demonstrates a range in rentals for basically similar apartments from $370 to $450 a month. Other evidence leads me to conclude that the owner made a decision to favor long time tenants with below market rents. Plaintiff has therefore chosen not to maximize rent receipts. Rudd v. Cranford, Tp., supra, 4 N.J.Tax at 243. Even if plaintiff felt for *641 some reason that it would benefit from this practice, economic rent must be based on market rent without regard to the particular or peculiar circumstances of the owner. Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 226, 417 A.2d 1124 (App.Div.1980), certif. den. 85 N.J. 459, 427 A.2d 559 (1981).
I agree with Judge Crabtree’s holding in Rudd v. Cranford that economic rent is the highest rent achievable for each class of apartments, provided there are no discernible differences within the class, which in this case is $450 a month for the thirty-four 3.5 room apartments.[2] In a community without rent control, the economic rent for substantially similar apartments cannot, as plaintiff suggests, be a range of rentals. The highest rent for the two 4.5 room apartments, $475 a month, will likewise be considered economic. The total gross rent is therefore $16,250 a month, or $195,000 for the year.
Plaintiff’s expert has proffered a 2% vacancy-and-collection-loss factor. I find that such a figure is acceptable, especially where the economic rent represents a significant increase over the actual rent roll. Rudd, supra, 4 N.J.Tax at 243. The rental income after vacancy is therefore $191,100. No evidence having been offered to the contrary, I also accept taxpayer’s figures for laundry commissions and miscellaneous income of $1,064, for a total gross income of $192,164. Taxpayer’s expert estimated expenses at $51,457, or 29% of his gross income estimate, and claimed that these expenses rise proportionately with any increases in gross income. While there is some dispute over these expenses, I find them to be reasonable and accordingly allow 29% of gross income, or $55,728, as an allowance for expenses. Net income to the property is, therefore, $136,436.
Taxpayer’s expert also proffered a capitalization rate of 15.03%. He bases this rate on published statistical data on *642 mortgage interest rates and equity returns, his general knowledge of the real estate market, data on competing investments and returns from sales in the market place. While I agree with his mortgage interest rate and his mortgage equity ratio, I find that the equity portion of his capitalization rate is overstated. I find a more reasonable equity rate to be 8%. This court may reject the capitalization rate proposed by an expert and select its own rate of return. Buchler v. Fort Lee, 2 N.J.Tax 228, 239 (Tax Ct.1981). The court may use the evidence as a basis for applying its own knowledge to determine a proper capitalization rate. Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985). The resulting capitalization rate, using an equity return of 8% is 14.53%.
The true value for the subject property is therefore the net income, $136,436 divided by the capitalization rate, 14.53%, for a total of $938,995. The ratio of assessment, $929,300, to this true value is 98.97%, which is above the upper limit of the common level range for the City of Garfield for 1983, which is 98%, thereby requiring relief.
Plaintiff claims as a final point that the ratio which the court should use is the rounded school-aid ratio.[3] The use of this ratio, which has an upper limit of 97.12%, does not change the outcome of this case, and as such a discussion of the propriety of its use is meaningless at this time.
The true value, $938,995, multiplied by the average ratio, 85%, results in an assessment of $798,146, rounded to $798,100. The assessment is allocated in the same proportion as the original assessment as follows:
Land $120,200
Building 677,900
Total $798,100
The Clerk of the Tax Court is directed to enter judgment accordingly.

 Taxpayer’s expert did not include the rental value of the superintendent's apartment in income, nor did he deduct it from income as an expense.

 I agree with taxpayer's expert that the rental value of the superintendent’s apartment is not includable in gross income since it is not deducted as an expense.

 See N.J.S.A. 54:1-35.1 wherein the Director of the division of Taxation is empowered to promulgate a table of equalized valuations derived from the apportionment ratio of the State School Aid Act of 1954.