TAX COURT OF NEW JERSEY



**Joshua D. Novin**
**Judge**

**Washington & Court Streets, 1st Fl.**
**P.O. Box 910**
**Morristown, New Jersey 07963**
**Tel: (609) 815-2922, Ext. 54680**
**Fax: (973) 656-4305**

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

June 29, 2017

Barry J. Cohen, Esq.
Amster & Rosensweig, P.C.
33 Harrison Avenue
P.O. Box 1
Waldwick, New Jersey 07463

William R. Betesh, Esq.
Boggia & Boggia, L.L.C.
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660

> Re:  Main Union Associates v. Little Falls Township
>        Docket Nos. 003613-2014, 006726-2015, and 004938-2016

Dear Mr. Cohen and Mr. Betesh:

This letter constitutes the court's opinion following trial of the local property tax appeals in the above-referenced matters. Main Union Associates ("plaintiff" or "Main Union") challenges the 2014, 2015, and 2016 local property tax assessments on an improved parcel of real property located in the Township of Little Falls ("defendant"), County of Passaic and State of New Jersey.

For the reasons stated more fully below, the court affirms the 2014, 2015, and 2016 tax year assessments.

## I.  **Procedural History and Findings of Fact**

As of the valuation dates, Main Union was the owner of the real property and improvements located at 195-203 Main Street, 32-42, 36, 44-46, and 48-54 Union Avenue, Little Falls, New

1

Jersey. The property is identified on the tax map of Little Falls Township as Block 92, Lot 5 (the "subject property"). For the 2014, 2015, and 2016 tax years, the subject property was assessed as follows:

Land:          $1,560,000
Improvement: $3,200,000
Total:          $4,760,000

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Little Falls Township was 89.82% for the 2014 tax year, 90.34% for the 2015 tax year, and 90.80% for the 2016 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the implied equalized value of the subject property is: $5,299,487.80 for the 2014 tax year; $5,268,983.80 for the 2015 tax year; and $5,242,290.70 for the 2016 tax year.

The subject property is a 2.53 acre, irregularly shaped, rectangular parcel located at the southeast corner of the intersection of Main Street and Union Avenue in Little Falls Township. Vehicular access to the property is provided from Union Avenue. The subject property occupies a very good location, in close proximity to the Little Falls train station, and with reasonable access to interstate and state highways.

The subject property is improved with a well-maintained 52-unit brick garden apartment complex. One of the 52 apartment units is occupied by a resident superintendent, who is afforded "free" rent for superintendent services. The complex consists of 48 one-bedroom units and 4 two-bedroom units. The buildings were constructed approximately in 1965, and consist of seven two-story buildings organized in four separate sections. Each building contains either a full or partial basement for tenant storage. The apartment complex contains an on-site management office, located in the basement of one of the buildings. Two of the buildings contain laundry areas for tenant use. Each apartment is heated by a central-gas-fired boiler with a baseboard hot water

heating system. Air conditioning is supplied by individual wall units. The landlord furnishes each apartment with one air conditioning unit, an oven/range, and refrigerator. Each apartment has a three-fixture bathroom. As the apartments are vacated, plaintiff performs updating of the appliances and fixtures on an "as needed" basis. Evidence was offered during trial that a few units have been completely renovated with new kitchen cabinets, new countertops, and stainless steel appliances. However, conflicting testimony was presented during trial regarding exactly how many apartments were updated. Approximately one-half of the apartments contain new bathroom plumbing fixtures.

In addition to owning the subject property, plaintiff and/or its principals also own an 80-unit apartment complex located diagonally across Main Street from the subject property, known as The Brownstone. The superintendent for Main Union also serves as superintendent for The Brownstone, rendering services to The Brownstone's tenants. Furthermore, the on-site management office for the subject property serves as management office for The Brownstone. However, the employees staffing the on-site management office are employees of The Brownstone complex, and not employees of Main Union. Thus, according to plaintiff's appraiser, Main Union's expense statements for the 2013, 2014, and 2015 calendar years reflect a payroll reimbursement to The Brownstone, representing approximately forty percent of the total payroll obligations. The forty percent represents a fraction, the numerator of which is the number of apartment units in Main Union and the denominator of which is the total number of apartment units in both the Main Union and The Brownstone complexes (52/132 = 39.39%).

As of all the valuation dates involved herein, Little Falls Township had enacted a rent control ordinance, known as Chapter 178, which was applicable to the subject property. Chapter 178 limits the rent increase a landlord may charge for "housing space" to a percentage of the

3

consumer price index. Moreover, Chapter 178 provides that when "housing space covered by this chapter shall be vacated by the tenant, the landlord may establish a new base rent." Thus, when an apartment unit is vacated, Chapter 178 contains a vacancy-decontrol provision thereby permitting the landlord to charge a new decontrolled base rent.

The subject property is located in the R-2 Residential Garden Apartment zoning district with permitted uses that include multi-family structures and accessory buildings. The R-2 zoning district requires a minimum lot size of ten acres. As the subject property contains 2.53 acres, the use of the subject property as an apartment complex is considered a legally permitted non-conforming use. The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

Plaintiff timely filed Complaints directly with the court challenging the 2014, 2015, and 2016 tax year assessments on the subject property. Defendant timely filed Counterclaims with the court asserting that the 2014, 2015, and 2016 tax year assessments on the subject property were less than its true value. The matters were tried to conclusion over a two-day period.

During trial, plaintiff and defendant each offered testimony from a State of New Jersey certified general real estate appraiser, who were accepted by the court, without objection, as experts in the field of property valuation. Each appraiser prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates.

The appraisers offered their opinions that the subject property had a true market value as follows:

|  | 10/1/2013 | 10/1/2014 | 10/1/2015 |
|---|---|---|---|
| Plaintiff's appraiser | $3,701,500 | $3,917,100 | $3,955,900 |
| Defendant's appraiser | $5,270,000 | $5,270,000 | $5,350,000 |

4

## II.    Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient

evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court independently concludes that plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiff all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiff's appraiser and the facts upon which he relied raise debatable questions regarding the correctness of the local property tax assessment on the subject property for the 2014, 2015, and 2016 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., supra, 100 N.J. at 413).

b. <u>Highest and Best Use</u>

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. <u>See</u> <u>Petrizzo v. Edgewater</u>, 2 <u>N.J. Tax</u> 197, 200 (Tax 1981); <u>Genola Ventures v. Shrewsbury Bor.</u>, 2 <u>N.J. Tax</u> 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. <u>Ford Motor Co. v. Township of Edison</u>, 10 <u>N.J. Tax</u> 153, 161 (Tax 1988), <u>aff'd o.b.</u>, 12 <u>N.J. Tax</u> 244 (App. Div. 1990), <u>aff'd</u>, 127 <u>N.J.</u> 290 (1992). <u>See also</u> <u>General Motors Corp. v. City of Linden</u>, 22 <u>N.J. Tax</u> 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." <u>Entenmann's Inc. v. Totowa Borough</u>, 18 <u>N.J. Tax</u> 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." <u>Ford Motor Co.</u>, <u>supra</u>, 10 <u>N.J. Tax</u> at 161.

The phrase highest and best use is defined as follows:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u> (5th ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive."

7

Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, after consideration of the highest and best use criteria, both plaintiff's appraiser and defendant's appraiser concluded that the highest and best use of the subject property, as vacant, is for multi-family residential development in accordance with the R-2 Residential Garden Apartment District zoning regulations. Moreover, after giving consideration to all legally permitted, physically possible, financially feasible, and maximally productive alternate uses, both plaintiff's appraiser and defendant's appraiser concluded that the highest and best use of the subject property, as improved, was the existing use as a 52-unit apartment complex.

The court finds that the highest and best use conclusions of both appraisers are supported by the trial record. Accordingly, the court determines that the highest and best use of the subject property, as if vacant, and as improved, is the existing use of the subject property as a 52-unit apartment complex.

c. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291

8

(2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Township, 4 N.J. Tax 51 (Tax 1982).

      1.   Income Capitalization Approach

Here, both appraisers determined that the income capitalization approach was the most suitable method to derive an estimate of market value for the subject property. The court concludes, as did the appraisers, that the income capitalization approach is the most appropriate method to value the subject property.

When a property is income-producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). The income capitalization approach is "based on the principle of anticipation, which states that value is created by the expectation of benefits to be derived in the future. In other words, the value of an apartment property reflects what a prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period." Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd

ed. 2008). Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Bor., 1 N.J. Tax 373, 377 (Tax 1980).]

Thus, the first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, supra, at 97. Forecasting a property's gross rental income requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270; see also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

a. Market Rent

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, supra, at 121-22. The market rent ascribed to a property under the income approach may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which

may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

In order to compute the subject property's annual apartment rental income, both appraisers agreed that it was necessary to examine the subject property's rent rolls as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates. However, after reviewing the rent rolls, plaintiff's appraiser and defendant's appraiser reached very different conclusions with respect to the subject property's estimated annual rental income.

Plaintiff's appraiser calculated the subject property's annual rental income by examining plaintiff's September 25, 2013, September 25, 2014, and September 24, 2015 rent rolls. Copies of said rent rolls were attached as exhibits to plaintiff's appraiser's report. Main Union's rent rolls reported gross monthly apartment rental revenues of: $62,278.47, as of September 25, 2013; $63,650.05, as of September 25, 2014; and $65,710.93, as of September 24, 2015. Thus, to compute the subject property's estimated annual apartment rental income, plaintiff's appraiser multiplied the monthly gross apartment revenue by 12 months. Plaintiff's appraiser determined an annual apartment rental income of: $747,341.64, for the 2014 tax year ($62,278.47 x 12); $763,800.60, for the 2015 tax year ($63,650.05 x 12); and $788,531.16, for the 2016 tax year ($65,710.93 x 12).

Similarly, in computing his "Gross Apartment Revenue," defendant's appraiser examined Main Union's September 25, 2013, September 25, 2014, and September 24, 2015 rent rolls. Defendant's appraiser further consulted Main Union's "Move Outs" statements, and Income and Expense Statements for the tax years ending 2013, 2014, and 2015. The "Move Outs" statements identify, by unit number and date, when a tenant vacated an apartment during the calendar year. However, the "Move Outs" statements do not reveal how long said units remained vacant, when

the units were re-let, or the new rental amount for such units. Ultimately, defendant's appraiser rejected the vacancies reported on plaintiff's "Move Outs" statements, and "accepted the vacancy as reported on the rent rolls." Defendant's appraiser "stabilized" the apartment rents for the 2014, 2015, and 2016 tax years "in recognition of" the unit-months "of reported vacancy." Unfortunately, defendant's appraiser offered no clear explanation or delineated formula to the court describing how he calculated the "stabilized" apartment "revenues for recognition of any vacancies" as of "12/31/2013," "12/31/2014," and "12/31/2015." Defendant's appraiser computed "stabilized" annual apartment rental revenue of $757,886, for the 2014 tax year; $757,500, for the 2015 tax year; and $782,152, for the 2016 tax year.

> In Parkview Village Assocs. our Supreme Court explained that:

> > [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project. . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.

> > [Parkview Village Associates v. Collingswood, 62 N.J. 21, 34 (1972).]

Thus, the actual rents paid by tenants of a well-managed apartment complex are clear evidence of economic rent. G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982).

When an apartment complex is well-managed, the court is required to accord the taxpayer a presumption that the actual rent collected as of the assessing date equals the economic rent. Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985). When the "gross rental value of the property on the respective assessing dates . . .[is] based on the actual rent rolls and. . . no convincing

testimony [was presented] that the management was not charging market rent," that is the most trustworthy evidence of income. Jefferson House Investment Co. v. Chatham, 4 N.J. Tax 669, 676-77 (1982). Moreover, when a property experiences a period of vacancy decontrol, the "proper method of arriving at the economic rent. . . , where there is proof of competent management, is to annualize the actual rents as of the assessing date. This approach contemplates that the assessor, in each year during the transition period from rent control to free market rentals, would reassess the property based on the changed rentals on each assessing date until the transition is substantially completed." Frieman v. Randolph Township, 8 N.J. Tax 264, 271 (Tax 1986), aff'd, 216 N.J. Super. 507 (App. Div.1987) (emphasis added). "An analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984). Thus, when available, the "actual rent roll" of a property as of the "critical assessing date" is fundamental to determining the true value of a property. Glen Wall Assocs., supra, 99 N.J. at 274.

A municipality can only overcome the presumption accorded a well-managed apartment complex by presenting "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Village Apartments Co., supra, 108 N.J. at 272.

Here, none of the foregoing exceptions applies. Defendant failed to offer any evidence, let alone "convincing evidence," that the subject property was not well-managed; that plaintiff's September 25, 2013, September 25, 2014, and September 24, 2015 rent rolls did not reflect market rent because they arose from old, long term leases; or that defendant has analyzed not less than four competitive apartment complexes, and determined that plaintiff's rents are not economic. Moreover, defendant offered no evidence that plaintiff failed to maximize the permissible rents

13

under Little Falls Township's rent control ordinance, or that following a vacancy, plaintiff neglected to establish a new base market rent under the ordinance's vacancy decontrol provisions. In sum, defendant offered no empirical evidence to lead the court to conclude that the actual rents collected by plaintiff and rent rolls, as of October 1st of each pre-tax year, were not representative of economic rent. Accordingly, the court concludes that the actual rents paid by tenants, and reported on plaintiff's September 25, 2013, September 25, 2014, and September 24, 2015 rent rolls, are the best evidence of economic rent.

However, accepting the rent rolls as evidence of economic rent, as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates, does not invariably lead the court to conclude that plaintiff's appraiser's or defendant's appraiser's computation of annual rental income is entirely accurate. The evidence and testimony adduced during trial revealed that a significant and material deficiency existed in both plaintiff's and defendant's appraisers' calculations of the subject property's annual rental income.

According to the testimony and appraisal reports of plaintiff's appraiser and defendant's appraiser, respectively, their annual computations of rent "[e]xcludes free supers apartment," and "excludes apartment occupied by on-site superintendent." However, the court's review of the September 25, 2013 and September 25, 2014 rent rolls disclosed that they ascribed a monthly "Rent Charge" to 51 apartment units. Moreover, as of the date of preparation of the September 25, 2013 rent roll, apartment unit 38-D was vacant and unoccupied, and thus ascribed no "Rent Charge." In addition, the September 25, 2014 rent roll contains a handwritten notation "46-B Imandt $1,238.70." However, the "Rent Charge" of $1,238.70, ascribed to apartment unit 46-B, was not included in the September 25, 2014 rent roll's monthly gross rental totals. Furthermore, the evidence offered during trial revealed that the on-site superintendent, "Joseph Diaz," did not

14

occupy either unit 38-D or unit 46-B. Thus, when the court ascribes a "Rent Charge" to apartment unit 38-D, or includes apartment unit 46-B in the computation of the monthly rent roll, all 52 apartment units in the complex are ascribed a "Rent Charge." In other words, the monthly rent rolls, relied on by plaintiff's and defendant's appraisers to compute their annual rental income, fail to exclude the on-site superintendent's apartment. Neither plaintiff, nor defendant identified the apartment unit occupied by the on-site superintendent, nor the "Rent Charge" ascribed to his unit. Thus, contrary to the evidence and testimony adduced during trial, the annual rental income calculations offered by both plaintiff's and defendant's appraisers included a "Rent Charge" ascribed to the on-site superintendent's apartment.

Further, during cross-examination, plaintiff's appraiser came to realize that Main Union's September 25, 2013 rent roll ascribed "no rent charge amount. . . for unit 38-D," and the September 25, 2014 rent roll ascribed no rent charge to unit 46-B. Thus, plaintiff's appraiser admitted that his annual rental income calculations for the 2014 and 2015 tax years were "understated." During cross-examination, plaintiff's appraiser readily admitted that such miscalculation "was my error." In sum, plaintiff's appraiser's computation of the subject property's annual rental income for the 2014 and 2015 tax years inadvertently omitted rental income.

Moreover, the September 24, 2015 rent roll attributes a monthly "Rent Charge" to all 52 apartment units, with no units being reported as vacant. Thus, plaintiff is either receiving rent from the on-site superintendent, or ascribing a monthly "Rent Charge" to the on-site superintendent's apartment unit.

According to the "Move Outs" statements, unit 38-D was vacated on September 3, 2013. Apartment unit 38-D was subsequently rented shortly thereafter for the sum of $1,300 per month.

15

Additionally, as of September 25, 2014, apartment unit 46-B was occupied at a monthly rent of $1,238.70.

Therefore, the court shall compute the annual rental income for the subject property, as of the October 1, 2013 valuation date, as follows: the court accepts plaintiff's September 25, 2013 rent roll as evidence of market or economic rent totaling $62,278.47. To the aforesaid sum, the court adds a monthly "Rent Charge" of $1,300, representing the monthly market rent for unit 38-D. Thus, the total estimated monthly rental income for the subject property, as of October 1, 2013 valuation date, is $63,578.47 ($62,278.47 + $1,300 = $63,578.47). Correspondingly, the estimated annual rental income for the 2014 tax year is $762,941.64 ($63,578.47 x 12 months = $762,941.64). The court shall compute the annual rental income for the subject property, as of the October 1, 2014 valuation date, as follows: the court accepts plaintiff's September 25, 2014 rent roll as evidence of market or economic rents totaling $63,650.05. To the aforesaid sum, the court adds a monthly "Rent Charge" of $1,238.70, representing the monthly rent for unit 46-B. Thus, the total estimated monthly rental income for the subject property, as of the October 1, 2014 valuation date, is $64,888.75 ($63,650.05 + $1,238.70 = $64,888.75). Correspondingly, the estimated annual rental income for the 2015 tax year is $778,665 ($63,650.05 x 12 months = $778,665).

The court shall compute the annual rental income for the subject property, as of the October 1, 2015 valuation date, as follows: the court accepts plaintiff's September 24, 2015 rent roll as evidence of market or economic rents totaling $65,710.93. Because the aforesaid sum accounts for a "Rent Charge" for all 52 apartment units, the court need not add to the monthly totals. Thus, the estimated annual rental income for the 2016 tax year is $788,531.16 ($65,710.93 x 12 months = $788,531.16).

16

b.  Other Income

Main Union's income and expense statements reflected additional or *other income* derived from late charges, bad check charges, laundry amenities, application fees, re-rent fees, short-term lease renewals, and reimbursed legal fees, as follows: (i) $5,399, for the 2014 tax year; (ii) $8,127, for the 2015 tax year; and (iii) $4,374, for the 2016 tax year.  Thus, in calculating the Effective Gross Income, plaintiff's appraiser included the total amounts reflected above, as additional or *other income* for the subject property for the 2014, 2015, and 2016 tax years.

Conversely, defendant's appraiser included only additional or *other income* arising from re-rent fees, short-term lease renewals, laundry amenities, reimbursed legal fees, and application fees.  Thus, defendant's appraiser calculated additional or *other income* for the subject property of: (i) $5,399, for the 2014 tax year; (ii) $4,066, for the 2015 tax year; and (iii) $3,427, for the 2016 tax year.  In sum, defendant's appraiser excluded from his calculation of the Effective Gross Income amounts attributable to late charges and bad check charges.

In an apartment project, the income that a property owner receives is not merely income generated from the rental of the real estate, but rather is the net income of the business conducted on the real estate.  Thus, it is common in an apartment complex to generate "non-rent other income" from a variety of sources, including parking, amenities (such as a pool or tennis court), laundry facilities, application fees, late charges, etc. The Valuation of Apartment Properties, supra, at 13.  In effect, under certain circumstances, a percentage of an apartment complex's income stream may be "imputable to intangible as well as tangible personalty." Id. at 99.  When performing an income capitalization approach to value an apartment complex, the difficulty arises in segregating the income attributable to the use of the real estate from the income generated by the operation of the business.

The term Potential Gross Income comprises and is defined as:

> rent for all space in the property – e.g. contract rent for current leases, market rent for vacant or owner-occupied space. . .
> rent from escalation clauses
>
> reimbursement income
>
> all other forms of income to the real property – e.g., income from services supplied to the tenants, such as. . . storage, and garage space, and income from coin operated equipment and parking fees.
>
> [The Appraisal of Real Estate, supra, at 478.]

Accordingly, the court concludes, as did defendant's appraiser, that amounts paid as rent, fees for services provided by the property owner, expenses reimbursable to the property owner, and amounts received for amenities furnished should be included as additional or *other income*. Thus, the court shall include the re-rent fees, short-term lease renewals, laundry amenities, reimbursed legal fees, and application fees as additional or *other income* of the subject property. Conversely, the court shall exclude from additional or *other income* the late charges and bad check charges.

Moreover, the term Effective Gross Income is defined as the "anticipated income from all operations of the real property after an allowance is made for vacancy and collection losses and an addition is made for any other income." The Appraisal of Real Estate, supra, at 451 (emphasis added). Thus, the court concludes, as did plaintiff's appraiser, that the additional or *other income* should be added to the Potential Gross Income only after the appropriate allowance has been made for vacancy and collection losses.

c. Vacancy and Collection Loss

Vacancy and collection losses are "usually estimated as a percentage of Potential Gross Income, which varies depending on the type and characteristics of the physical property, the

18

quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate, 478 (14[th] ed. 2013).

Plaintiff's appraiser applied a vacancy and collection loss factor of 2% of Potential Gross Income for the 2014, 2015, and 2016 tax years. Plaintiff's appraiser explained that he applied the subject property's actual vacancy rate for each tax year, which he computed at 1.5%. Moreover, based on his experience, he determined that a collection loss factor of 0.5% should apply.

Defendant's appraiser reviewed Main Union's "Move Outs" statements to calculate the actual reported vacancy for the subject property, which he discerned was 2.40% for the year ending 2013, 1.12% for the year ending 2014, and 1.38% for the year ending 2015. In addition, defendant's appraiser consulted apartment vacancy rates of the Passaic County submarket, published by Real Estate Information Services ("REIS"), which revealed average vacancy rates of 2.40% for the 2013 calendar year, 2.90% for the 2014 calendar year, and 2.50% for the 2015 calendar year. Defendant's appraiser further reviewed vacancy rates for The Brownstone and Park Lane Apartments, the immediately adjacent garden apartment complexes. His review of those similar complexes disclosed vacancy rates between 1.40% - 1.77%, for the 2014 tax year; 1.67% - 2.81%, for the 2015 tax year, and 1.14% - 2.81%, for the 2016 tax year. Accordingly, defendant's appraiser applied a stabilized vacancy rate of 2.50%, and a collection loss of 1%, for each tax year, or an overall vacancy and collection loss factor of 3.50%.

The court finds plaintiff's appraiser's 2014 tax year vacancy rate is not supported by credible evidence. Although plaintiff's appraiser expressed that the 2014 tax year vacancy rate for the subject property was 1.5%, evidence introduced during trial revealed that the subject property's vacancy rate was actually 2.40%.

19

Additionally, although market data can be a very effective and useful tool in discerning vacancy rates, the court concludes that the actual vacancy rates faced by a well-managed apartment complex are the most compelling evidence of vacancy during the tax years at issue. The REIS reports relied on by defendant's appraiser are not controlling because it is unclear whether those vacancy rates apply to market rate rental units or units that are subject to rent control ordinance, like the subject property.

Thus, giving the most weight to the vacancy experience rates of the subject property during the tax years at issue, the court accepts the following vacancy rates as credible market evidence: 2.50%, for the 2014 tax year; 1.5%, for the 2015 tax year; and 1.5%, for the 2016 tax year. Moreover, the court finds defendant's appraiser's collection loss factor of 1% the most reliable evidence for the 2014, 2015, and 2016 tax years. Therefore, the court will apply a vacancy and collection loss factor of 3.50% for the 2014 tax year, and a vacancy and collection loss factor of 2.5% for the 2015 and 2016 tax years.

### d. Operating Expenses

The third step in the income capitalization approach is determination of the appropriate operating expense deductions. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management." The Appraisal of Real Estate, supra, at 479.

Plaintiff's appraiser stabilized operating expenses for management and reserves at 5% of the Effective Gross Income. In addition, plaintiff's appraiser stabilized repair and maintenance expenses at the subject property's three year average. The balance of the operating expenses deducted by plaintiff's appraiser for salaries, snow removal, grounds maintenance, utilities, water, extermination, insurance, professional fees, office expenses, travel and truck expenses, telephone,

20

inspection fees, and miscellaneous expenses were the subject property's actual incurred expenses. According to plaintiff's appraiser, he was satisfied, based on his review and comparison of the operating expenses of the subject property to the operating expenses of The Brownstone apartment complex, that the subject property's operating expenses were reasonable. Plaintiff's appraiser did not consult, analyze or review any other market data, surveys or reports, or engage in any analysis to ascertain whether the actual operating expenses of the subject property were reflective of the marketplace.

Conversely, because certain expenses including the superintendent, on-site management office, and employee salaries were shared between The Brownstone and Main Union, defendant's appraiser accepted only limited actual reported expenses and elected to stabilize the balance. Defendant's appraiser accepted Main Union's reported expenses for water and sewer, utilities, insurance, and repairs and maintenance. Defendant's appraiser stabilized management expenses at 5%, and miscellaneous expenses at 1%, of the Effective Gross Income. Defendant's appraiser further stabilized landscaping and snow removal fees, advertising, professional fees, payroll, and reserves.

However, conspicuously absent from both plaintiff's appraiser's and defendant's appraiser's stabilized operating statements were any deduction for the value of the superintendent's apartment unit. As set forth above, the September 25, 2013 rent roll, September 25, 2014 rent roll, and September 24, 2015 rent roll, relied on by both plaintiff's and defendant's appraisers in establishing the annual income for the subject property, ascribed a "Rent Charge" to the superintendent's apartment unit. It is well-settled that when an appraiser ascribes a rent charge to a "free" apartment unit occupied by the on-site superintendent, a corresponding expense deduction must be accounted for in the operational expenses of the property. See Parkway Village

21

Apartments Co., supra, 8 N.J. Tax at 446 (concluding that "an allowance must be made for the apartments of the superintendent and the assistant superintendent, this being appropriate because the owner was charged with the income to be achieved from these two units yet was not receiving the rent in full because the apartments constituted additional compensation to the stated employees."); see also Double R Enterprises v. Bordentown Twp., 12 N.J. Tax 455, 468 (Tax 1992); River Drive Village v. City of Garfield, 7 N.J. Tax 632, 641 (Tax 1985); Brunetti v. City of Clifton, 7 N.J. Tax 161, 177 (Tax 1984); Knollcroft Apartments v. Fair Lawn Borough, 3 N.J. Tax 25, 37 (Tax 1981).

The failure of both plaintiff's appraiser and defendant's appraiser to deduct, as an operating expense, the imputed annual value of the superintendent's unit on their stabilized operating statements renders the stabilized operating expenses of little value to the court. Moreover, any deduction that the court could apply to the stabilized operating expenses would be based merely upon supposition and conjecture. Neither plaintiff's appraiser nor defendant's appraiser could identify for the court the apartment unit occupied by the superintendent, or the "Rent Charge" which was ascribed to that particular unit. The court's review of the rent rolls discloses a rent range of $588.30 to $1,550.00 per month. Thus, if the court attempted to ascribe a deduction value to the superintendent's apartment unit, and used an inaccurate value, the resulting Net Operating Income would be materially affected. Moreover, any deviation in Net Operating income may cause the corresponding computation of the subject property's true value to be inaccurate.

Because neither plaintiff nor defendant presented the court with this crucial operating expense information, the court is unable to discern the Net Operating Income of the subject property. Accordingly, the court is unable to derive an estimate of value for the subject property using the income capitalization approach.

**III. Conclusion**

For the above stated reasons, the court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the 2014, 2015, and 2016 tax year assessments on the subject property exceed its true value. In addition, the court further concludes that defendant has failed to prove, by a fair preponderance of the evidence, that the 2014, 2015, and 2016 tax year assessments on the subject property are less than its true value.

Accordingly, the court will enter judgment dismissing plaintiff's Complaints, defendant's Counterclaims, and affirming the local property tax assessments in this matter.

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.