HOPKINS, J. T. C.
This is an appeal from judgments of the Bergen County Board of Taxation applicable to the assessed values of property known as Block 2603, Lot 6, Block 2608, Lot 14, and Block 2611, Lot 11, in the taxing district of Fair Lawn, all of which were assessed as a single line item for the tax years 1974 through 1978.
For the tax year 1974 the original assessment was $1,140,700, which was divided between the land at $198,100 and the improvement at $942,600. The county board sustained the land assessment but reduced the improvement assessment to $795,-500, for a total assessment of $993,600. Thereafter, the taxing district adopted the county board assessment figures. The parties have stipulated that the common level of assessment for the tax years 1974 through 1977 was 48.2% and that the provisions of chapter 123 of the Laws of 1973 would determine the statutory common level for the tax year 1978.
The subject property is located in the northeasterly sector of the Borough of Fair Lawn and a short distance west from the boundary line with the Borough of Paramus. It has frontages on Sperber Road, Stuart Place and Sampson Road. The general area is comprised almost entirely of residential, single-family dwellings ranging from the modest, older Cape Cod styles to newer and larger split-levels and ranch-type homes. Immediately adjoining this property to the north is a contiguous garden-apartment complex known as Knollcroft Gardens, and to the west across Sampson Road is a large vacant parcel of land. There are single-family dwellings to the south and east.
Combining the three parcels results in a rectangular area intersected by Stuart Place and Sperber Road. The combined land area totals 5.66 acres.
All three lots are improved with typical FHA 608-type garden-apartment buildings that were built in the 1950s. The project comprises 34 two-story and part basement buildings containing a total of 136 apartment units or 484 rooms. The *29 apartment mix is 60 three-room apartments and 76 four-room apartments. There are 16 garages. The buildings are of part brick veneer and part asbestos shingle construction, with asphalt-shingled, gable and hip roofs. The interior construction consists generally of hardwood floors, plaster walls and ceilings and metal casement-type sash. The kitchens have composition or linoleum covered floors, double drainboard sink, wooden cabinets, a four-burner range with oven and a small capacity electric refrigerator. Bathrooms have three fixtures with showerhead over the tub and tile finishing in the tub area. Room sizes are relatively small, and the apartments have limited closet space.
They are heated by three hot water boilers through convector type radiators and fired by No. 4 oil. The part basements contain, in addition to the boiler rooms, some storage areas, coin laundry rooms, meeting rooms, etc., with the balance of the area under the apartments being crawl spaces or garages.
The improvements overall are in fair condition. Site improvements include paved driveways and parking areas, with the balance of the land being lawns with shrubbery.
In or around 1965 one Sam Gorovoy, a 42% owner of the outstanding corporate stock involved, commenced a shareholder action in the Superior Court, Chancery Division, Bergen County, against Knollcroft Apartments, Inc., and others, in an effort to require dissolution of the corporations. Among the defendants were Charles Gorovoy and Hyman Gorovoy, the managers of the subject property, as will be later detailed. On July 1, 1970 a stipulation of settlement was effected between the executors of the estate of Sam Gorovoy and the other parties wherein, among other things, all the stockholders of Knollcroft Apartments, Inc., agreed that said corporation would refinance its present mortgage and thereafter liquidate, so that the subject apartment complex would be owned by a partnership with the shareholders as partners in the same percentage as they were shareholders in the corporation. It was also agreed that the subject apartment complex would be sold within three years of the effective date of that agreement and a complete liquidation and distribution of *30 the partnership assets would be made to all parties in interest. If the apartment complex was not sold within that three-year period, all parties agreed that any stockholder could apply to the Superior Court of New Jersey, Chancery Division, Bergen County, for an order of sale of all or any part of said premises and that all stockholders, by consenting to the stipulation of settlement, consented to the entry of such order. In the latter part of 1971 the subject property was refinanced through a mortgage loan given by the Howard Savings Institution in the amount of $1,275,000, which had installment repayments computed on a 25-year payout, at an interest rate of 85/s%, with the balance being due at the end of 15 years. As of July 1, 1973, the expiration date of the three-year period during which the subject property was required to be sold, there were negotiations in process between Charles Gorovoy, as an 8% partner who represented the partners then owning the subject property, and Investors Funding Corporation of New York, (hereinafter Investors Funding), relative to the sale of the subject property together with two additional apartment house complexes in the area. Charles Gorovoy was also one of the managers of the three apartment complexes being sold.
Under date of October 12, 1973 a contract for the sale of the subject property, together with the two other apartment complexes, was entered into between Investors Funding and the partnerships which owned the apartment complexes. The contract provided that Investors Funding would pay the sum of $775,000 in excess of the principal balance of the mortgages as of December 1, 1973, as well as assume the mortgages. Of the aforesaid amount $311,000 was allocated to the purchase of the subject property. Prior to the date of closing Investors Funding assigned its rights under the aforesaid contract to Fair Lawn Company, a New Jersey limited partnership, with offices at the same address as Investors Funding. On November 30, 1973 a closing took place wherein title to the subject property passed from Knollcroft Apartments Associates to Fair Lawn Company, a limited partnership.
*31 On the same date as the closing an agreement was entered into between a partnership known as Knollcroft Apartments, which was composed of Charles Gorovoy and his brother Hyman Gorovoy, as tenant, and Fair Lawn Company as landlord, to lease the subject property for a period of 25 years with two options to renew for an additional 25 years each. Said lease was a net lease wherein all expenses relative to the operation and maintenance of the property were to be borne by the tenant. The rental was at the rate of $153,340 a year for the first ten years, and $155,680 a year during the balance of the term. Said rental could be increased after ten years if the Consumer Price Index justified it, in accordance with a formula in the lease.
The lease further provided that upon full payment of the first mortgage held by Howard Savings Institution, the rental would be reduced by 50%. Further, in the event the landlord chose to refinance the first mortgage, the lease would be subject to the new mortgage. In the event the new mortgage was for an amount in excess of the balance of the Howard Savings Institution mortgage at the time of the refinancing, the excess of the mortgaged amount would be divided equally between the landlord and the tenant. There was also a provision that the annual payment of principal and interest on any refinancing should not exceed the rental payment of $155,680 a year. If such mortgage payment was less than the prior annual payment of mortgage principal and interest, then the rental payment would be reduced by 50% of such difference. The lease could be mortgaged by the tenant and also could be assigned without the consent of the landlord, provided the assignment disposed of the tenant’s entire interest in the lease and the assignee provided the landlord with an assumption agreement by which all the tenant’s obligations under the lease were assumed.
At the closing Fair Lawn Company gave a mortgage to Investors Funding in the amount of $1,564,550, with interest at the rate of 7V4%. The mortgage was a wrap-around mortgage encompassing the prior mortgage held by the Howard Savings Institution which had an unpaid principal balance of $1,244,-871.77. The wrap-around mortgage, which was subject to the *32 Fair Lawn Company lease, was assigned to the Chase Manhattan Bank on December 20, 1973 as collateral for Investors Funding’s obligations to that bank.
During all the years here involved, there was a rent control ordinance in effect in Fair Lawn.
Plaintiff introduced opinion testimony in support of a true value which was predicated, in most part, on the capitalization of income approach. The sale of the subject property on November 30, 1973 was also used to support the opinion of true value under a market data approach. The market data approach was predicated on plaintiff’s expert’s opinion that the sale at that price was an arm’s-length sale and that the assignment of the contract to the limited partnership was merely the assignment of the contract rights to a dummy corporation for the purpose of taking title. Further, consistent with said approach, the subsequent wrap-around mortgage given by Fair Lawn Company to Investors Funding was deemed to be a nullity because it was treated as a mortgage given to one’s self. The leasehold agreement with the Knollcroft Apartments partnership, composed of Charles and Hyman Gorovoy, was not given any weight, for it was the expert’s opinion that the purchase was only being effected because the Gorovoys were going to lease and manage the property.
The procedure followed by plaintiff’s expert in determining the estimated net income of the subject property was to treat the rent roll as of the October 1 assessment date as the gross annual rental estimate and add to it the sum of $2,000 to $2,800 on an ascending scale for each year as sundry income (laundry). From this was subtracted a vacancy and rent loss allowance of 2%, as well as stabilized expenses based on expenses incurred in the pre-tax year.
The adjustments to stabilize expenses as to the tax year 1974 were a reduction in repairs and maintenance by $5,134 to stabilize them at $3,000 and a reduction in payroll taxes from $3,300 to $1,300.
*33 In all years he stabilized legal and accounting expenses at $1,500; stabilized miscellaneous expenses at $2,500; eliminated telephone expenses and included a deduction for the superintendent’s apartment which he had previously included in gross rents, even though it was occupied rent-free. Also, the amount of $5,500 was included as a replacement reserve consisting of three oil burners, tanks and controls, at a cost of $12,000, with a 25-year life, for a $480 reserve; 34 roofs at $1,200 each, with a 20-year life, for a $2,040 reserve; 136 refrigerators at $200 each, with a 15-year life, for a $1,813 reserve, and 136 gas ranges at $175 each, with a 20-year life, for a $1,190 reserve. In addition, for all years the management expense was restricted to 5% of effective gross rent.
Plaintiff estimated the value of the land at $408,000 on the basis of $3,000 a unit for the 136 apartments located on the property. The capitalization rate was arrived at by assuming a 9.5% interest rate on a 75% mortgage loan, with an annual constant of 11.19% on a 20-year term. This together with an estimated 10% dividend on the equity portion, resulted in an overall rate, under the band of investment approach, of 10.89%. To this was added the stipulated effective tax rates. The above approach resulted in plaintiff’s expert’s conclusion that the true value of the property, including the $408,000 which was uniformly applied to the land, was as follows:
1974 $1,550,000
1975 $1,465,600
1976 $1,542,000
1977 $1,552,700
1978 $1,689,700
Defendant’s expert, while recognizing the three approaches to value, primarily relied upon the income approach as well as a hybrid approach which he considered to be in the market approach category. This latter approach reached a value by deducting from the net rental to the owner the payment necessary to amortize the wrap-around mortgage. This left a net income attributable to the fee owner of $17,224. He then determined a net profit to the lessee by subtracting real estate taxes and annual rental from the net income from the operation *34 of the property. By adding the aforesaid computed net income to the fee owner and the net profit to the lessee, he reached a total of $27,667 which he capitalized at 10% or $276,670. This latter figure he added to the face value of the wrap-around mortgage to conclude an indicated value by the sale of $1,841,-217.
In effect, defendant’s market approach to value was the acceptance of the face value of the wrap-around mortgage as an integral part of the property value and he then added to that amount a figure resulting from 10% capitalization of the net income remaining after payment of taxes and mortgage amortization, to arrive at a total value of $1,841,000.
Defendant’s income approach to value was predicated upon utilizing income actually realized during the tax year for the purpose of determining the value as of October 1 of the prior year. In taking the actual rents he also included miscellaneous income which ranged from approximately $13,500 to approximately $14,500 during each of the years. These figures were taken from a certified application by Charles Gorovoy to the Rent Leveling Board of the Borough of Fair Lawn. He used actual expenditures for the tax years involved, with the exception of the management fee which he stabilized at 5% of total gross income. His capitalization rate was computed by the band of investment approach in assuming a mortgage ratio of 75% and an interest rate of 7.25% over a 24-year, 10-month term, which resulted in an annual constant of 8.7%. An equity return of 10% resulted in a basic return rate of 9.03%. The capitalization rate was then computed by adding to the basic return rate the effective tax rate as published by the Division of Taxation. In so doing he arrived at values for each of the years involved as follows:
1974 $1,809,800
1975 $1,952,800
1976 $1,961,200
1977 $1,993,800
1978 $2,166,600
*35 It is recognized that the subject property is investment property which is commonly valued on its investment return. However, such valuations, predicated on a capitalization of income, should be tested, where possible, by utilizing a market approach. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 544, 189 A.2d 702 (1963). Accordingly, it is necessary to determine whether the sale of the property in November 1973 was a sale which should be considered meaningful in determining the true value of the subject property.
As previously detailed, the sale was pursuant to a stipulation which settled litigation wherein a 42% shareholder of the corporation that owned the subject property and two other properties had desired to have the corporation liquidated. On his death the litigation was settled with the requirement that the property be sold within three years. Despite that long period of time, the property was not sold until several months after the expiration of the three-year period. The sale was one in which a minority shareholder who, with his brother, had previously managed the properties, received back a lease which gave him and his brother certain rights which were more in the nature of an equity ownership than that of a true tenant. Those rights included sharing in any benefits resulting from a refinancing of the mortgage then encumbering the property, to the extent that, if a larger loan was obtained which still permitted an amortization at the same monthly payment, the amount of the loan that exceeded the outstanding balance of the Howard Savings mortgage would be split equally between the tenant and the fee owner. Further, after the mortgage was amortized, the rents would be reduced to one-half of the rents provided in the lease. Adding to this the fact that the lease was for 25 years with two options to renew for an additional 25 years, or a total of 75 years, inevitably leads to the conclusion that the sale was not one that can have any great evidential value for the purpose of determining the true value of the subject property. This would also apply to the wrap-around mortgage which was subordinate to the lease.
*36 Accordingly, the factual background requires a value predicated upon the capitalization of income approach. The basic differences which the parties have in determining the appropriate income for each year is that plaintiff took the actual rent roll as of the October 1 assessment date and defendant took the actual rents received during the tax years involved. Further, plaintiff estimated miscellaneous income ranging from $2,000 for the tax year 1974 and increased by $200 a year for each of the years involved. On the other hand, defendant took actual miscellaneous income as reported by the taxpayer in its efforts to obtain a rent increase from the rent leveling board of the taxing district. These latter figures were supported by testimony of the managing partner, who admitted that miscellaneous income approximated $14,000 for each of the years involved. However, he also testified that approximately $3,000 of the miscellaneous income was attributable to the rental of parking spaces on an adjacent property, which property is not here involved. That property was used without charge by the taxpayer as long as it was kept free from weeds, the grass area maintained and the sidewalks kept clear of snow in the winter. The taxpayer used approximately an acre and a half to two acres which it had graded and graveled for parking.
The use of the actual rent roll as of the October 1 assessment date is consistent with sound valuation practices. Valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight. New Brunswick v. Tax Appeals Div., supra at 545; 189 A.2d 702; Parkview Village Ass’n v. Collingswood, 62 N.J. 21, 29, 297 A.2d 842 (1972); Stanford Enterprises v. East Orange, 1 N.J.Tax 317, 323 (Tax Ct. 1980). Accordingly, the rental income for each of the tax years involved will be as utilized by plaintiff. However, plaintiff’s miscellaneous income is substantially understated. As the annual miscellaneous income, which approximated $14,000, included $3,000 applicable to parking on an unrelated property, miscellaneous income should have some reduction to reflect that situation. Obviously, there is included in operating expenses the *37 expenditures necessary to maintain the parking area as well as expenses to collect the parking rents. Conversely, there is no certainty that the arrangement with the adjacent property owner will last indefinitely. Accordingly, $1,500 of the $3,000 will be deemed miscellaneous income. On the basis of the testimony of the managing partner, as well as the details contained in defendant’s appraisal report, miscellaneous income will be as follows:
1974 $12,000
1975 $11,968
1976 $13,038
1977 $13,423
1978 $13,489
Since the apartments were rent-controlled and the evidence indicates full occupancy, the allowance for vacancies and rent losses will be 1% of effective gross rent.
In determining the applicable expenses for each of the years the parties again differed in that defendant took expenses for the actual tax year involved rather than the expenses as known or anticipated as of the assessing date. Once the adjustment as to the correct year’s expenses is effected, the basic difference between the two parties is the use by plaintiff of a replacement reserve of $5,500, and the deduction attributable to the superintendent’s apartment. Both parties allowed a 5% management expense. Accordingly, the court will accept the stabilized operating expenses of plaintiff with appropriate deduction for the superintendent’s apartment rental and a reduction in the replacement reserve from $5,500 to $2,500. This latter adjustment is made to eliminate a reserve for refrigerators and gas ranges which undoubtedly would be replaced out of normal operating expenses in a rental operation that was subject to rent control.
Both parties computed their capitalization rate by use of a band of investment utilizing 75% financing and a 10% return on equity. The difference was in the economic mortgage rate and the mortgage term.
*38 Plaintiff’s use of statistical information, covering all tax years, as published by the American Council of Life Insurance based upon reports to it of loans by insurance companies, is a much sounder approach than the use of the interest rate on the previously described wrap-around mortgage which has been given no weight. Further, as the improvements were approximately 20 years old during the periods involved, a 20-year mortgage term is more realistic than a 24-year, 10-month term. Added to the basic return rate will be the effective tax rate computed on the basis of the stipulated common level for 1974 to 1977 and the chapter 123 ratio for 1978.
The resulting computations are as follows:
1974 1976 1977 1978
Income $ 309,810 $ 324,118 $ 384,314 $ 345,978 $ 366,342
Less 1% (3,098) (3,241) (3,343) (3,460) (3,663)
Rental Income 306.712 320,877 330,971 342,518 362,679
Misc. Income 12,000 11,968 13,038 13,423 13,489
318.712 332,845 344,009 355,941 376,168
Management (5%) (15,936) (16,642) (17,200) (17,797) (18,808)
Other Oper. Exp. (77,641) (101,160) (99,000) (109,027) (118,110)
Est. Net Income 225,135 215,043 227,809 229,117 239,250
Gap. Rate 13.59% 13.69% 13.78% 13.75% 13.25%
True Value 1,656,622 1,570,803 1,653,186 1,666,305 1,805,660
Common Level 48.2% 48.2% 48.2% 48.2% 40%[1]
Assessed Value 798,492 757,127 796,836 803,159 722,264
For the purposes of segregating the aforesaid assessments between land and improvement, the land will be valued on the basis of $3,000 per apartment unit or a total land value of $408,000.
The Clerk of the Tax Court is directed to enter a judgment in accordance with the above.

The stipulated common level of assessment was used for the tax years 1974 through 1977 as the assessment was substantially in excess thereof. In re Appeal of Kents, 34 N.J. 21, 166 A.2d 763 (1961). The common level assessment ratio for 1978 is the 40% ratio provided by Chapter 123 as the assessment/true value ratio exceeds the range provided by N.J.S.A. 54:2-40.4.