**TAX COURT OF NEW JERSEY**



**CHRISTINE M. NUGENT**
**JUDGE**

153 Halsey Street
Gibraltar Building – 8th Floor
Newark, New Jersey 07101
609 815-2922, Ext. 54610
Fax: 609 815-2923

March 12, 2020

Nathan P. Wolf, Esq.
673 Morris Avenue, Suite 1
Springfield, New Jersey 07081

Matthew J. O'Donnell, Esq.
O'Donnell McCord, PC
15 Mount Kemble Avenue
Morristown, New Jersey 07960

> Re: Steven Fano v. East Orange City
> Docket Nos.: 002241-2014; 007507-2015; 006253-2016

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-cited matters challenging the assessments on taxpayer's property for tax years 2014, 2015 and 2016.[1] For the reasons outlined more fully below, the court will enter Judgments reducing the assessments for tax years 2014 and 2015.

## I. Procedural History and Findings of Fact

Plaintiff is the owner of real property located in the defendant municipality of East Orange. The property is designated as block 711, lot 9 on the official municipal tax map and is commonly known as 131-135 South Harrison Street ("Subject Property"). For tax years ("TY") 2014 and 2015 the Subject Property was assessed as follows:

| | |
|---|---|
| Land | $ 245,000 |
| Improvement | $ 1,406,900 |
| Total | $ 1,651,900 |

---

[1] During trial plaintiff withdrew its appeal of TY 2016 and advised he would rely on N.J.S.A. 54:51A-8 (the "Freeze Act").






Plaintiff filed timely Complaints with the Tax Court challenging the referenced assessments. At trial each party proffered an expert witness who prepared a report and testified as a New Jersey licensed General Real Estate Appraiser opining on value. As part of the appraisal assignment, plaintiff's expert conducted a personal inspection of the Subject Property. Per defendant's expert, he conducted an exterior inspection and relied on an employee in his office to inspect the property's interior. Both experts utilized the income approach to value. Their opinions are expressed below:

| TY | Valuation Date | Value | |
|----|----------------|-------|--|
| 2014 | 10/1/13 | Plaintiff's Expert: | $1,240,000 |
| | | Defendant's Expert: | $1,865,700 |
| 2015 | 10/1/14 | Plaintiff's Expert: | $1,146,200 |
| | | Defendant's Expert: | $1,842,000 |

The Subject Property is located about one-half block from the East Orange/Orange border, and approximately two blocks from Interstate 280. The Subject improvement is a four-story elevator building containing 35 apartments configured with 25 one-bedroom and 10 two-bedroom units on a lot measuring 100 x 291 square foot, or .6692 acres. Constructed around the late 1920s, the building has a concrete foundation, brick/block exterior walls, and a flat roof. There is minimal landscaping. A steel door serves as the front building entrance with access also provided at the back of the building through the basement area. Each entrance is equipped with an operative intercom security system. An asphalt surface parking lot is located behind the building, and there are no parking garages. The building fronts South Harrison Street. Access to the parking lot is

via Berwyn Street, which runs alongside of the building. According to plaintiff's expert access to the parking requires travel over an easement owned by East Orange.[2]

The Subject Property has been owned by the Fano family for over 22 years, and at the time of trial was owned by plaintiff, Steven Fano, who operated the property for five years. A semi-automatic elevator, equipped with a steel door, services the floors. The steel door was installed several years ago which replaced an elevator gate previously in place. The hallways are painted, with ceramic flooring and fluorescent lighting. The apartments are small. Entry into the one-bedroom unit leads directly into the living room. The two-bedroom unit has an entry hall that leads to the living room, and due to the small kitchen size, some tenants use the entry hall as a kitchenette. There was no other testimony about the unit interiors though defendant's expert provided some interior photographs. The apartment photos depict hardwood floors in the bedrooms and living rooms; painted bathroom walls, with tile floors and vanities; and painted kitchens with white appliances. The building contains a laundry room with coin-operated machines in the basement. Tenant use was discontinued after the report of some criminal activity and several robberies of the coin box. The concessionaire decided not to continue due to the high insurance cost attendant to operation of the laundry facility. According to plaintiff's expert, the Subject Property is in poor condition, but defendant's expert describes the condition as fair to average. Based on his personal inspection of the property the court affords more weight to the plaintiff's expert's testimony about the condition of the Subject.

---

[2] Defendant's expert was unaware of the easement and claims no such encumbrance was reported. While plaintiff's expert found the easement was critical to access parking at the Subject Property, he made no adjustment to his value conclusion based on the easement or on his concern about its future uncertainty.

3

Utilities to the building include electricity, public water and sewer, natural gas and telephone. The building has a full-time superintendent whose day-to-day job includes overall cleaning, building security, arranging for outside contractor repairs and showing vacant or available apartments to prospective tenants. The superintendent occupies a one-bedroom basement apartment rent-free and he receives a modest salary. The building is subject to the East Orange rent control Ordinance which limits rent increases. As of the valuation date, per the Ordinance, the landlord is permitted only one rent increase during any twelve-month period. Rent to a first time, new tenant is limited to 5% over the last rent paid by the former tenant. As to rent increases between landlord and current tenants, the following applies: for a periodic tenant with a lease term less than one year, the rent increase is limited to 2% over the existing rent; and for year-to-year tenants, or for tenants whose lease term exceeds one year, the rent increase is limited to 2% of the prior rent for each twelve-month period of the existing lease (i.e., a landlord is entitled to a maximum increase of 6% on a fixed-rent, three-year lease at the end of the third year). East Orange, N.J., Code § 218-1 to -33 (1980).

Both experts opined the Subject Property's highest and best use is continued use as an apartment building. The court concurs with the experts and finds that to be the highest and best use of the Subject Property.

II.    **Conclusions of Law**

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985).

"In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW, 18 N.J. Tax at 377. Before proceeding to weigh the evidence, the court "must first determine whether the presumption of validity has been overcome." Ibid. "In making this determination, the court should view the evidence as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. Such a determination requires that the court accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000). Only after the presumption is overcome with sufficient evidence at the close of proofs must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982) (citations omitted).

Defendant moved to dismiss the appeal for failure to overcome the presumption. The court denied the motion having found that plaintiff produced sufficient evidence to raise a debatable question regarding the validity of the assessment, and thereby overcame the presumption of validity attached to the assessment as to both tax years, for the reasons placed on the record at trial. Therefore, the court will proceed to consider the evidence presented by both parties in an effort to find value. Ford Motor Co. v. Township of Edison, 127 N.J. 290 (1992).

**A. Approach to Value**

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income, and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.) (citing Appraisal Institute, The Appraisal of Real Estate (11th ed. 1996), certif. denied, 168 N.J. 291 (2000). "There is no single determinative approach to the valuation of real property." 125 Monitor St. LLC v. Jersey City, 21 N.J. Tax 232, 237-8 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244, 251 (Tax 1980)). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Div. of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51 (Tax 1982)).

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). The court finds that the income capitalization approach is the best method for determining value of the Subject Property, an income producing apartment building.

**B. Income Capitalization Approach**

In the income capitalization approach,

> the gross rental value of the property is estimated. From the
> estimated gross rental there is deducted a factor for possible

6

> vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. Borough of West Caldwell, 1 N.J. Tax 373, 377 (Tax 1980).]

Central to the income capitalization approach, and the first step in the process, is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. City of Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

The court in Parkview Village Assocs. established a presumption in appeals of local property assessments that apartment houses are well managed and that actual rents realized represent market rent. The court there established the following general rule for determining economic rent:

7

In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. That approach, we believe, conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fair rental value.

[62 N.J. at 34-35 (citations omitted).]

See Parkway Village Apartments Co., 108 N.J. at 272 ("a municipality can only overcome the presumption that actual rent does not equate to market rent by presenting 'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties"). When the "gross rental value of the property on the respective assessing dates . . . [is] based on the actual rent rolls and . . . no convincing testimony [was presented] that the management was not charging market rent," that is the most trustworthy evidence of income. Jefferson House Inv. Co. v. Chatham Borough, 4 N.J. Tax 669, 676-77 (1982).

"An analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984). Accordingly, when available, the "actual rent roll" of a property as of the "critical assessing date" is fundamental to determining the true value of a property. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 274 (1985).

1. **Market Rent**

In arriving at market rent, both experts relied on actual rents at the Subject Property as of October 1, 2013 and October 1, 2014, annualized, to calculate potential gross income (PGI). However, the rent rolls the experts used were not identical so their PGI calculations differed.[3] Only defendant's expert included rent for the superintendent's apartment in his calculation of PGI. Where rent from a superintendent's unit is included in gross income it requires the deduction of a reciprocal expense. No reciprocal expense was recorded by the expert in this case, and the record lacks the evidence necessary to permit the court to calculate the figure. See Parkway Village Apartments Co., 8 N.J. Tax at 446 (concluding that "an allowance must be made for the apartments of the superintendent and the assistant superintendent, this being appropriate because the owner was charged with the income to be achieved from these two units yet was not receiving the rent in full because the apartments constituted additional compensation to the stated employees."); see also Double R Enter. v. Bordentown Township, 12 N.J. Tax 455, 468 (Tax 1992); River Drive Village v. City of Garfield, 7 N.J. Tax 632, 641 (Tax 1985); Brunetti, 7 N.J. Tax at 177; Knollcroft Apartments v. Fair Lawn Borough, 3 N.J. Tax 25, 37 (Tax 1981). As such, the court finds that excluding rent for the superintendent's unit, as occurs at the Subject Property, provides the best evidence in the record for determining market rent.

Defendant's expert testified that he undertook a market survey of comparable apartment rentals to further his selection of economic rent, and that he also used the study results in his selection of the rate for vacancy and collection loss ("V&C"). (V&C to be discussed more fully within). According to the expert, the survey reveals rents at the Subject Property at the lower end

---

[3] Differences in unit rents appeared (i.e., at unit 3B for tax year 2013, and unit 4H for 2014), as did the unit number of the superintendent's apartment (unit 2E versus unit B3), and each expert attributed a different rent to the superintendent's unit.

of the range, or around 20% below the average of similar type units. From that he concluded that it would be inappropriate to apply a high V&C rate, theorizing that tenants would not be inclined to leave a building where rents were low, but he never varied from his use of actual rent or his concluded value. Cross-examined about the survey, the expert testified that perhaps he should have calculated a higher PGI on the theory that the Subject Property was not well managed, over counsel's objection to the expert's ruminations. The market survey contains a bare listing of eight different one-bedroom and two-bedroom East Orange apartment units and the units' asking rents, bereft of any analysis. Likewise, defendant's expert sought to rely on operating statements for other East Orange apartment buildings he had reviewed in the past but without any further analysis, production of the operating statements, or identification of the particular buildings. The court's review of the Subject Property's rent rolls shows yearly increases for nearly all units and the expert acknowledged that the East Orange rent control board as operated is fairly liberal and apt to adjust rent increases to an accelerated pace over just the annual increases where yearly rent increases are insufficient. Thereby, the evidence weighs against any inference that the Subject Property was not well managed, and that plaintiff did not maximize rents. The court rejects defendant's expert's suggestion that the Subject Property's rents were below market as a bare allegation unsupported by sufficient reliable data.

Plaintiff's expert testified that he is a life-long resident of East Orange and an owner/manager of apartment buildings in the city. The court finds credible his testimony that the expert's familiarity with the Subject Property dates back some 50 years, it has been appraised by him on multiple occasions, and that he has known and dealt with the owner's family for twenty years. On that basis, the court finds the evidence of Subject Property unit rents utilized by plaintiff's expert to be more credible and accepts the rent rolls set forth in his expert report for

both tax years. On that basis the court accepts plaintiff's expert's calculation of PGI at $335,700 for TY 2014 and PGI of $345,672 for TY 2015.

In addition to rent the experts considered the inclusion of other income from parking and the laundry concession. Both experts included parking income (plaintiff's expert: $5280, and defendant's expert: $4320), and plaintiff's expert included income for laundry commission ($2400), based on his understanding as an owner/manager of apartment buildings in East Orange that a coin operated laundry facility would typically be a feature. As the evidence made clear, income from the laundry concession at the Subject Property ceased some time ago. Based on the testimony the court finds it unreasonable to expect that an investor could rely on that service as a future income stream for the property. As for the parking, neither expert was certain whether the Subject Property ever generated parking income. For those reasons, the court finds the inclusion of other income is unsupported by the record.

2. **Rate for Vacancy and Collection Loss (V&C)**

Vacancy and collection loss is "usually estimated as a percentage of Potential Gross Income which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate, 478.

The rates selected by the experts for V&C varied by 5%. Plaintiff's expert opined a 10% rate and defendant's expert selected 5%. Both rates represent a marked difference from the activity at the Subject Property, where the difference between potential rent and rent collected was 20% to 22% as of the valuation dates. Plaintiff's expert testified to a high number of tenants dispossessed through court proceedings, along with problems like the closure of the laundry room due to

11

criminal activity and the high cost of insurance. As for the tenant dispossession process, it was time consuming for the owner, often requiring repeat court appearances, with no rent collected during the process. Due to tenant dispossessions and tenant abuse of the property, "along with other factors," plaintiff's expert opined that the Subject Property occupancy would never exceed 90% and found the actual vacancy rate at the property to be typical of the East Orange market. Defendant's expert disagreed.

A third-party investor survey, the 2013 and 2014 third-quarter Price Waterhouse Cooper (PwC) National Apartment Market-Select Survey Responses, formed the primary basis for the 5% rate selected by defendant's expert (and as further support the expert relied on his market rent survey previously described). The PwC survey responses revealed vacancy factors ranging from a low of 1% to a high of 15%, with the preponderance falling between 3% to 8%, so defendant's expert chose 5% as the appropriate rate for both years. Plaintiff sought to discredit the survey results when on cross-examination defendant's expert acknowledged that the PwC survey results appear to be limited to six investor responses, and both the geographic location of the market and a description of the apartment buildings' size or type surveyed went unidentified.

During cross-examination on the issue defendant's expert was confronted with financial documents he had collected and analyzed from three East Orange properties the expert relied on in his report as expense comparables. The expert acknowledged that the documents reflect varying East Orange V&C rates between 10% and 32%, contrary to his opinion that the Subject Property rate of 20% was atypical of East Orange.[4] Confronted with the inconsistency, the expert explained

---

[4]    Notably, the outcome of the market rent study undertaken by defendant's expert further revealed an elevated East Orange V&C rate, which the expert lowered as a means of reconciling his market rent conclusions.

12

that in purchasing properties investors rely not on actual vacancies but on survey results that represent the properties' stabilized occupancy rate.

The court finds the published survey results are not in conflict with the other evidence of elevated East Orange V&C rates. PwC reports V&C rates up to 15%. Plaintiff's expert report includes the Marcus & Millichap Apartment Research Market Report for Northern New Jersey ("M&M"), Third Quarter 2013. There, the vacancy rate for the area was reported as increasing but still below the national average of 5%. However, the M&M reported vacancy ranking, broken down among the North Jersey area, includes a category for Newark/Orange/East Essex County with a reported vacancy rate of 7.8% (which does account for collection loss). Based on the foregoing, the court finds that a 10% V&C rate for both tax years is well supported by the record.

3. **Operating Expenses**

Both experts stabilized operating expenses in arriving at net income and their total figures differed by about 6%. Plaintiff's expert concluded an expense ratio of 44.07% of PGI for TY 2014, and 43.27% for TY 2015. Defendant's expert stabilized expenses at 37.86% of PGI for both years. Plaintiff's expert categorized expense items using the Subject Property's 2011-2015 Income and Expense Statements ("I&E"), took the five-year average, then stabilized each expense to a dollar amount. He added together the expenses for all categories and compared total expenses to actual PGI to arrive at an aggregated ratio, rather than a ratio for each expense category. He found that the aggregate ratios were in line with the ratios published in the Institute of Real Estate Management ("IREM") for New Jersey Northern Elevator Buildings, and for elevator buildings in Regions 1 and 2 (which includes New York, New Jersey, and New England).

Rather than stabilizing each expense category to a dollar amount, defendant's expert developed a stabilized ratio of expense to PGI for each expense category. In stabilizing the

expenses, defendant's expert reviewed the 2012-2015 Subject Property's I&Es categorizing the expenses in a reconstructed statement. He examined the actual expenses and averaged each expense category, also noting year-year differences in the expenses reported, to arrive at a stabilized ratio. He then compared the results against market data he had developed into expense ratios from three East Orange apartment buildings selected by him to serve as expense comparables.[5]

Defendant's expert faced cross-examination regarding his analysis of and reliance on the expense comparables' operating statements. For each expense comparable, he calculated a three-year average (using 2011-2013 operating statements) and developed a ratio of expense to PGI utilizing the same categories contained on his reconstructed Subject Property operating statement. Defendant's expert developed one stabilized expense figure to serve as the comparable expense ratio in each expense category, for use in both 2014 and 2015. Because the operating statements for two of the three expense comparables contained more than one rent column, each with a different rent total, counsel challenged defendant's expert's use of reported PGI to arrive at the comparable ratios. The court's review of the statements reveals a potential variance of 8% to 10% PGI could result depending upon which column was used. The expert explained that he takes that kind of discrepancy into account in stabilizing the final ratio for each categorized expense. The court finds credible defendant's expert's testimony that he considered the income discrepancy in developing the stabilized comparable expense ratios and accepts the expert's stabilized ratios as evidence of normal market expenses.

i.      **Utilities, administration, management, insurance and miscellaneous**

---

[5]    In analyzing the expenses, the court will convert plaintiff's expert's dollar expense figure for each category to a percentage of PGI, for ease of analysis.

As for utilities, plaintiff's expert took a $38,600 five-year average of the owner's cost for electric and gas then stabilized the expense to $32,000 based on his personal experience that the owner of a building like the Subject Property would incur approximately $250 per room for heat and hot water, and $500 per month in electric expense to light the common areas (tenants paid their own electric). To that the expert added an average of the 2013-2105 cost for water and sewer. Plaintiff's expert stabilized utility expenses at 14.98% and 15.36% of PGI, for 2014 and 2015, respectively.

Using the same general methodology as he did with all of the expense categories, defendant's expert stabilized the utility expense to a concluded ratio of 12.97% of PGI and found the percentage to be consistent with the actual expenses reported by the property owner for 2013-2015 (those actual utility expenses totaled $53,521; $44,652 and $39,410 for average cost of $45,195 over three years which yields a ratio of 13.46% and 13.07% of PGI). The court will stabilize the expense at 14.0% for both tax years. The ratio is in line with the actual expenses reported and falls within the range of the utility expense comparables calculated at 9.41%, 10.72% and 21.08%.

In the administration category, the experts' conclusions differed by 2% of PGI and items included in the expense category differed. Plaintiff's expert included superintendent salary (which differed from reported expenses apparently based on the expert's conversations with the superintendent), rent for the superintendent's unit, a 10% payroll tax calculated by the expert, and phone/pager expense. Plaintiff's expert calculated an expense which converts to 7.1% of PGI for 2014 and 7.3% for 2015. Defendant's expert's administration expenses include a figure for

payroll, payroll taxes, office, professional fees,[6] telephone and advertising. He took an average of the 2013-2015 reported expenses calculated at $19,495, or 6.5% of PGI for 2014 and at 6.3% for 2015, then opined a stabilized expense at 4.5% of PGI for both tax years. On cross-examination the expert acknowledged that he had excluded certain employer-related state and federal taxes that should have been included. The court finds the evidence support a stabilized administration expense of 7.5% for both tax years, which falls within the range of normal market expenses based on the comparable ratios calculated to be 4.27%, 7.97%, and 13.53%.

As for the management fee, the experts' ratios differed only slightly. And while no fee appeared on the Subject Property I&Es, both experts agreed that a management fee is recognized by the market. Moreover, plaintiff's expert opined that management of the Subject building was time consuming given the need to appear for frequent court proceedings. Plaintiff's expert calculated management fees at 5.2% of PGI for 2014, and at 5.36% for 2015, and defendant's expert opined the percentage at 4.5% for both years. At the two expense comparables where a fee was reported the ratio was 3.82% and 5.19% of PGI. The court accepts 5% for both years as reasonable and supported by the record.

Plaintiff's expert concluded an insurance expense at 3% of PGI for both years, versus defendant's expert at 3.05%. Only defendant's expert included a miscellaneous expense to account for both sanitation and security, which he stabilized at a ratio of 1% of PGI for both years. The court accepts as reasonable the stabilized expenses for insurance expense at 3.05% and miscellaneous at 1%.

---

[6]     Plaintiff's expert included professional fees as a separate category to cover the owner's expense for accountants, engineers and inspection fees, but as with defendant's expert's reconstructed statement the court will include the fee as an administration expense.

16

### ii.    **Maintenance and repairs, reserves for replacements**

Plaintiff's expert's stabilized ratios for these categories, for the respective tax years, at 11.87% and 11.53% of PGI for maintenance and repairs, and at 2.20% and 2.16% of PGI as a reserve for replacements. Defendant's expert stabilized the expenses, for both tax years, at 7% for maintenance and repairs, and at 4.84% as a reserve for replacements. Both experts stabilized the expense categories based on their opinions of the required upkeep at a property like the Subject. Neither relied on the actual figures listed on the I&Es for maintenance and repairs, and the I&Es did not list a reserve for replacements. Both experts included an expense for a (structural) reserve for replacement, with plaintiff's expert at $7500, based on his understanding of what the FHA requires for apartment buildings the agency finances. In this category defendant's expert opined a dollar amount ($13,819) which he converted to 4% of PGI as a structural reserve for both tax years. He added the cost to replace appliances (kitchen stoves and refrigerators) which brings his total reserve for replacement ratio to 4.84% of PGI for both tax years.

Plaintiff's expert categorized the appliance cost in maintenance and repairs.[7] The court finds that the appliance expense properly belongs in the reserve for replacement category. While defendant's expert's market review did not include a reserve for replacement cost, the court's review of the 2012 and 2013 financial documents for 100 Chestnut St. Associates LLC (an expense comparable about which defendant's expert testified) shows reserve for replacement in 2012 at

---

[7]    The experts also differed as to the cost and economic life of the appliances, though neither relied on market data or actual cost. Defendant's expert calculated the expense at a higher dollar amount than plaintiff's expert, and with a longer life expectancy.   Plaintiff's expert estimated $450 per year over 12 years for refrigerator replacement and $375 per year over 15 years to replace the stoves.  Defendant's expert opined a cost of $700 per refrigerator per year over 12 years and $500 per year as an expense to replace for stoves, over 20 years.

3.16% of PGI and at 2.86% of PGI. The court accepts the 4.84% reserve for replacement ratio opined by defendant's expert as credible and within the range for normal market expenses.

In stabilizing the expense for maintenance and repairs, plaintiff's expert relied on his experience as an East Orange apartment owner/manager rather than on actual expenses. He included $30,000 intended to represent repairs by outside contractors and added $7800 as the cost to paint the apartments, hallways, building exterior and fire escapes. He testified that the exterior work is done every five to six years rather than annually, and stems from a five-year state inspection. In addition, each time a tenant vacates an apartment the city must issue a new certificate of occupancy after an inspection that requires the owner to clean and usually repaint the apartment. Plaintiff's expert stabilized total maintenance and repairs at $39,925 for both tax years. The court will subtract $2075 from the repair and maintenance expense amount to account for the cost the expert attributed to the appliances (moved to the reserve category by the court). That calculates to a total maintenance and repair cost of $37,850, or, a ratio of 11.27% to PGI for 2014, and 10.94% to PGI, for 2015.

Defendant's expert stabilized maintenance and repairs at 7% but the expense was again not based on the expenses incurred at the property. Actual expenses averaged from the 2012 through 2015 I&Es for the maintenance and repairs category calculates to a ratio of 19.2% to PGI for 2014 and 18.6% to PGI for 2015. The ratios greatly exceed the market. According to defendant's expert, the expense reported for 2014 was much higher than the surrounding years which could reflect a comingling of capital items and repairs. No other explanation for the difference was offered. For both tax years the court adopt defendant's stabilized expense of 7% as appropriate and within the range of the expense comparables at 6.79%, 6.64% and 6.25%.

18

Based on the above-state findings the court determines that the appropriate expense ratio for the subject property is 42.39% of PGI for both years under appeal. The IREM surveys are corroborative with reported third-quarter 2013 ratios at a high, middle and low of 47.3%, 40.3% and 32% for 2013, and a third-quarter 2014 range of between 46.6% and 39.8%.

4.      **Capitalization Rate**

The overall capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value." Appraisal Institute, The Appraisal of Real Estate, at 462 (13th ed. 2008). The overall capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Both experts relied on the Band of Investment technique for calculating an overall capitalization rate. "This technique is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, 16 N.J. Tax at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed. 1992)).

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
>
> [Appraisal Institute, Appraisal of Real Estate, 505 (13th ed. 2008).]

Both experts relied on investor surveys completed by market participants engaged in real estate financing transactions during given periods of time. Plaintiff's expert's opined that the

19

subject property is at best a second-tier investment property due to its condition, location, and municipal rent control restrictions. Experience managing and borrowing money for the purchase of apartment buildings formed the basis for his selection of the components he used to derive the overall rate. Plaintiff's expert estimated the availability of a 75% mortgage for 20 years with a 6% interest rate for each tax year. He estimated an equity return rate of 7.5% for 2014 and 8% for 2015. The expert testified that he consulted surveys published by the Real Estate Research Corporation Report ("RERC") for 3rd Quarter Fall 2013, and 3rd Quarter Fall 2014, reporting on overall capitalization rates for eastern states and for Northern New Jersey. The expert computed an overall capitalization rate of 8.325% for each tax year. After loading the capitalization rate with the effective tax rate (4.259% for 2014 and 4.475% for 2015), plaintiff's expert reached a total capitalization rate of 12.584% for 2014, and 12.80% for 2015.

Defendant's expert relied on the overall capitalization rates published by Korpacz/PwC ("Korpacz") for the National Apartment Market, Third Quarter 2013 and Third Quarter 2014, and on survey data published by the American Council of Life Insurance ("ACLI") Investment Bulletins. As an addendum to his report the expert reproduced ACLI tables that contained information arranged by loan type, property type, geographic location, etc. The expert utilized the published data to determine the band of investment components he found most appropriate for use in deriving his overall capitalization rates (other than the mortgage term which the expert calculated for each loan type). According to the expert he looked at the tables then "drilled down to the information most similar to the Subject Property," e.g., New Jersey properties, properties with less than 200 units, in reaching his conclusions.

For 2014, defendant's expert estimated the availability of a 60% mortgage for 30 years with a 4.4% interest rate, an equity return rate of 7%, and applied a 6.01% mortgage constant. For

2015, defendant's expert estimated the availability of a 65% mortgage at 4% interest, with an estimated equity rate of 8%, and applied a mortgage constant of 5.73%. He computed an overall capitalization rate of 6.4% for 2014 and 6.5% for 2015, and, testified that his derived rates fit within the surveys' ranges of overall capitalization rates. After adding the effective tax rates (4.259% for 2014 and 4.475% for 2015) defendant's expert concluded total capitalization rates of 10.66% and 10.98% for the respective tax years.

Plaintiff criticized defendant's expert's use of the ACLI data arguing that the member insurance companies would not provide financing to an investor seeking to purchase the Subject Property. Rather an investor would likely obtain a local bank loan, at a 20-year term. However, support for the local lending practices was lacking from the record. Instead the court will consider the survey data supplied by both experts. In "using [the] band of investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, 16 N.J. Tax at 82 (quoting Glen Wall Assocs., 99 N.J. at 279-80). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Id. at 83. See also Partridge Run Apartments v. Township of Parsippany-Troy Hills, 12 N.J. Tax 275, 278-289 (App. Div. 1992) (appropriate to rely upon ACLI surveys even if it is not the "best market evidence" in terms of developing an overall capitalization rate).

The court accepts the overall capitalization rates derived by defendant's expert since the components selected by him find support in the ACLI data. In addition, his overall capitalization rates are commensurate with the ACLI, Korpacz and RERC survey rates appearing in the experts' reports and reproduced below.[8]

| | ACLI Investment Bulletin | Korpacz |
|---|---|---|
| 10/1/2013 | 5%-8% | 3.5% - 10% |
| 10/1/2014 | 4.6% | 3.5% - 9% |

RERC 3rd Quarter Fall 2013- East region: tier II

| | | |
|---|---|---|
| IRR | Range- 5.8% – 12.0% | Average- 8.8% |
| Going-in rate | Range- 4.5% – 9.0% | Average- 7.2% |

RERC 3rd Quarter Fall 2013- Northern New Jersey: tier II

| | |
|---|---|
| IRR | 8.1 |
| Going-in rate | 6.4 |

## 5.    Calculation of Value

| | 2014 | 2015 |
|---|---|---|
| PGI: | $ 335,700 | $ 345,672 |
| Minus 10% V&C Loss: | -   33,570 | -   34,567 |
| Effective Gross Income | 302,130 | 311,105 |
| Minus Op. Exp. (42.39% x EGI) | -   128,073 | -   131,877 |
| Net Income | 174,057 | 179,228 |
| ÷ | | |
| Cap Rate | 10.66 | 10.98 |
| Value | 1,632,805 | 1,632,313 |
| Rounded to | $ 1,633,000 | $ 1,632,000[9] |

---

[8]    RERC information on capitalization rates for second-tier investment properties was provided for 3rd Quarter 2013, only.

[9]    Over plaintiff's objection, a Deed was introduced by defendant as evidence that the Subject Property sold on December 6, 2017 for $3,000,000. The sale occurred subsequent to both the exchange of expert reports and the first day of trial. Plaintiff urged the court to rule inadmissible

## C. **Chapter 123 Analysis**

Having determined the true value of the Subject Property, the court must next find the correct assessment. Pursuant to N.J.S.A. 54:51A-6, commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year that "the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property . . . . N.J.S.A. 54:51A-6(a). The formula for determining the Subject Property's ratio is:

$$\text{Assessment} \div \text{True Value} = \text{Ratio}$$

For TY 2014, the Chapter 123 common level ratio for East Orange City is .8677 with an upper limit of .9979 and a lower limit of .7375. Application of the formula results in a ratio that exceeds the upper limit: $1,651,900 \div 1,633,000 = 1.011$.

---

any testimony that the sales price corroborated the value opinion of defendant's expert arguing that the purchase price exceeded defendant's expert's value conclusion, the sale was remote in time, and a lower 2017 capitalization rate reflected by the sale was evidence that the market changed between 2017 and the valuation dates. To the contrary, defendant's expert argued that the sale corroborated his opinion of value in reliance on his conclusions regarding below-market rent at the Subject Property, his V&C ratio, and application of the 2017 capitalization rate. The parties briefed the issue. The court finds the sales evidence is not sufficiently reliable to be admitted as proffered for the following reasons: 1) the court found that the underlying conclusions regarding below-market rent lacked credible support, 2) the court rejected the 5% V&C rate, 3) defendant's expert testified that his costar research revealed the broker represented both buyer and seller and the Subject Property was never listed for sale on the open market, which renders questionable the usable nature of the sale, and 4) the record reflects changed economic conditions resulting from an amendment to the rent control ordinance in effect on October 1, 2016, which relaxed the permitted amount of existing tenant rent increase from 2% to 4%. East Orange, N.J., Code § 218-1 to -33 (2015).

Pursuant to N.J.S.A. 54:51A-6(b), the revised taxable value is determined by application of the common level ratio to the true value, calculated as 1,633,000 x .8677 = 1,416,954 (1,417,000 rounded). Accordingly, a judgment will be entered revising the assessment for TY 2014 as follows:

| | |
|---|---|
| Land | $ 245,000 |
| Improvement | $ 1,172,000 |
| Total | $ 1,417,000 |

For TY 2015, the Chapter 123 common level ratio for East Orange City is .8990 with an upper limit of 1.00 and a lower limit of .7642. Application of the formula results in a ratio that exceeds the upper limit: 1,651,900 ÷ 1,632,000 = 1.012

Pursuant to N.J.S.A. 54:51A-6(b), the revised taxable value is determined by application of the common level ratio to the true value, calculated as 1,632,000 x .8990 = 1,467,168 (1,467,000 rounded). Accordingly, a judgment shall be entered revising the assessment for TY 2015 as follows:

| | |
|---|---|
| Land | $ 245,000 |
| Improvement | $ 1,222,000 |
| Total | $ 1,467,000 |

The Clerk of the Tax Court is directed to enter judgments as set forth herein.

Very truly yours,

Christine M. Nugent, J.T.C.